**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 20-cv-02106-CMA-MEH

WILLIAM J. JOHNSTON,

Plaintiff,

v.

STANDARD FIRE INSURANCE COMPANY,

Defendant.

---

**ORDER SUSTAINING OBJECTIONS AND OVERRULING DISCOVERY ORDER**

---

This matter is before the Court on Defendant Standard Fire Insurance

Company's Rule 72(a) Appeal of and Objections (the "Objections," Doc. # 44) to

Magistrate Judge Hegarty's June 11, 2021, Order (the "Discovery Order," Doc. # 42).

For the following reasons, the Court sustains the Objections and overrules the

Discovery Order.

## I.      BACKGROUND

### A.      FACTUAL BACKGROUND

This is an insurance bad faith and breach of contract case. Plaintiff William J.

Johnston ("Plaintiff" or "Mr. Johnston") was in a vehicle accident on July 3, 2019. (Doc.

# 3 at ¶ 5.) Mr. Johnston was a passenger in a vehicle rear-ended by Shon Balthaser.

(*Id.* at ¶¶ 5–15.) Mr. Balthaser was determined to be the at-fault driver, and his liability

insurer paid policy limits of $100,000 to Plaintiff. (*Id.* at ¶¶ 17–21.) In the future, Plaintiff

may also recover liability payments from U-Haul Company of Arizona ("U-Haul"), for a maximum amount of coverage totaling $25,000. (*Id.* at ¶¶ 22–26.) However, U-Haul is currently determining how to apportion liability limits among all claimants. Thus, Plaintiff has not yet received any money from U-Haul.

At the time of the accident, Mr. Johnston had an insurance policy through Defendant Standard Fire Insurance Company ("Defendant" or "Standard Fire"), which provided underinsured motorist ("UIM") coverage up to $250,000. (*Id.* at ¶¶ 28–29.) Plaintiff also had UIM coverage through California Casualty, which was excess to any coverage provided by Standard Fire. (*Id.* at ¶¶ 30–31.)

Plaintiff maintains that Mr. Balthaser was underinsured. (*Id.* at ¶ 27.) As a result, Plaintiff sought UIM benefits from Standard Fire. According to Defendant, Mr. Johnston did not provide complete medical records after the accident. (Doc. # 42 at 3.) In his complaint, Mr. Johnston states that he provided Standard Fire with a medical authorization and Standard Fire successfully ordered medical records. (Doc. # 3 at ¶¶ 37–38.) Regardless, the Parties do not dispute that Standard Fire requested medical records related to Mr. Johnston's claim. (Doc. # 44 at 3; Doc. # 45 at 2.) Additionally, Standard Fire retained an orthopedic surgeon to conduct a review of Mr. Johnston's claim and medical records. (Doc. # 44 at 3.)

Standard Fire obtained a report from the orthopedic surgeon on May 27, 2020. (Doc. # 44 at 3; Doc. # 45 at 2.) Two days later, on May 29, 2020, Standard Fire informed Plaintiff that the records review had been completed, and Standard Fire was reviewing the orthopedic surgeon's report. (Doc. # 44 at 3.) Plaintiff did not wait on a

final decision related to the records review. Rather, just a few days later on June 1, 2020, Plaintiff filed suit against Defendant, asserting claims for: (1) Breach of Contract; (2) Statutory Bad Faith Breach of Contract; and (3) Common Law Bad Faith Breach of Contract. (Doc. # 3 at 4–6.)

In October 2019, before the lawsuit was filed, Mr. Johnston underwent surgery for a trans-lumbar interbody fusion. (Doc. # 45 at 2.) According to Plaintiff, Standard Fire's retained orthopedic surgeon stated in his May 2020 report that "25% of Mr. Johnston's need for surgery was caused by the collision." (Doc. # 45 at 2.) Thus, there appears to be a dispute regarding the extent to which Mr. Johnston's medical treatment was related to the accident.

Mr. Johnston continued to receive treatment after he filed this lawsuit, including undergoing an additional surgery in March 2021. (Doc. # 45 at 2.) Plaintiff also continued to submit medical records to Defendant, including records of ongoing treatment post-litigation, for Standard Fire's consideration. (Doc. # 44 at 1.) Plaintiff maintains that Standard Fire must consider all new medical records while at the same time defending this lawsuit.

Now, Plaintiff seeks all claim notes generated by Standard Fire after the lawsuit was filed. (Doc. # 44 at 1–2.) Plaintiff argues that these claim notes are necessary for his claims in this litigation. (Doc. # 45 at 2.) Specifically, Plaintiff argues that "[w]ithout seeing post-litigation claim notes[,] Mr. Johnston does not know if there is a genuine disagreement about the value of his contractual claim or not." (*Id.* at 5.) Plaintiff also

argues that without the post-litigation claim notes, he does not know if Standard Fire is continuing to act in good faith.

Defendant objects to production of the claim notes generated after this lawsuit commenced. (Doc. # 44.) Specifically, Defendant argues that the claim notes are not relevant because its "duties to negotiate, settle or pay Plaintiff's UIM claim abated upon Plaintiff filing suit." (Doc. # 44 at 2.) Further, even if the claim notes are relevant, Defendant argues that the post-litigation claim notes are protected by the attorney-client privilege and work product doctrine. (Doc. # 44 at 2.) At a discovery hearing before the magistrate judge, counsel for Defendant "proffered that after the lawsuit was filed, a new adjustor took over [the claim] file, and that adjustor has been communicating with defense counsel on a regular basis." (Doc. # 44 at 2.)

**B.    THE DISCOVERY ORDER**

On June 7, 2021, the magistrate judge held oral argument on the Parties' dispute regarding whether post-litigation claim notes are discoverable, and the magistrate judge issued a written order on June 11, 2021. (Doc. # 44 at 1.) The magistrate judge determined that Colorado law permits "more liberal discovery in this first-party case than in the third-party context," including in the UIM context. (Doc. # 44 at 3.) As a result, the magistrate judge also determined that Defendant "has a continuing statutory duty to affirm or deny coverage" of new medical records and expenses incurred after commencement of litigation. (Doc. # 42 at 4.) Thus, the magistrate judge granted Plaintiff's request for the production of post-lawsuit claim notes and evaluation reports. (*Id.* at 6.) The magistrate judge also directed Defendant to prepare a log for privileged

documents and submit that log to Plaintiff's counsel, in addition to providing the privileged documents for *in camera* review. (*Id.*)

## II.   LEGAL STANDARD

Under Rule 72(a) of the Federal Rules of Civil Procedure, a district court may reverse a magistrate judge's decision on a non-dispositive matter only if the decision is found to be "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). The "clearly erroneous standard . . . requires that the reviewing court affirm unless it "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)). "The contrary to law standard permits plenary review as to matters of law, but the Court will set aside a Magistrate Judge's order only if it applied the wrong legal standard or applied the appropriate legal standard incorrectly." *Seidman v. Am. Fam. Mut. Ins. Co.*, No. 14-cv-3193-WJM-KMT, 2016 WL 6518254, at *1 (D. Colo. Nov. 3, 2016) (citations, internal quotations, and alterations omitted).

Defendant filed its Objection on June 24, 2021 (Doc. # 44), and this matter is now ripe for review (Doc. ## 45, 49, 50).

## III.   ANALYSIS

### A.   DISCOVERY IN UIM CLAIMS

Colorado courts distinguish between first-party and third-party insurance claims, including discoverability in UIM cases. A first-party claim is between an insured and his insurer, where the insured is "asking for payment under the terms of the insurance

contract between him and the insurance company." *Silva v. Basin W., Inc.*, 47 P.3d 1184, 1191 (Colo. 2002) (quotation omitted). In contrast, a third-party claim involves liability investigations between a third-party and the insurer, and the investigation is made "in anticipation of claims which, if denied, will likely lead to litigation." *Id.* Accordingly, "[i]n a first-party claim, the insurance company owes a duty to its insured to adjust a claim in good faith that the insurance company does not owe" in third-party claims. *Id.* at 1193. Thus, Colorado courts have recognized broader discovery in first-party claims. *Id.*

Based on *Silva*, the magistrate judge determined that Colorado law permits "more liberal discovery in this first-party case than in the third-party context." (Doc. 42 at 3.) However, *Silva* was distinguished by *Sunahara v. State Farm Mut. Auto. Ins. Co.*, 2012 CO 30M, 280 P.3d 649. In *Sunahara*, the Supreme Court of Colorado recognized that UIM claims—such as in this case—are different from typical first-party claims. In the UIM context, the insurance company is in the "unique role of becoming almost adversarial to its own insured." *Id* at ¶ 28 (quotation omitted). Thus, with a UIM claim, the factfinder must weigh the evidence presented by the defendant's insurance company, "essentially standing in the shoes of the underinsured motorist, against the evidence presented by the injured plaintiff." *Id.* As a result, the *Sunahara* court held that the scope of discovery in first-party UIM actions is similar to third-party actions—like those discussed in the *Silva* case—because "the relationship between the parties is similarly adversarial." *Id.*

Based on *Silva* and *Sunahara*, the Court finds that discovery in this UIM case is not as broad as in typical first-party claims. Rather, in UIM claims, discovery is more akin to a third-party claim, where the insurer stands in the unique role of being adversarial to the insured. Accordingly, this Court finds that the magistrate judge's decision to permit more liberal discovery in this case is contrary to the law.

**B.   ABATEMENT AFTER A LAWSUIT IS FILED**

Because insurers have an ongoing duty of good faith to an insured which extends through litigation, there is considerable confusion regarding an insurer's duty to continue to evaluate and negotiate a settlement after the insured files suit. *See, e.g.*, *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010) (noting that an "insurer's duty of good faith and fair dealing continues unabated during the life of an insurer-insured relationship, including through a lawsuit or arbitration between the insured and the insurer, although the adversarial nature of such proceedings may suspend the insurer's obligation to negotiate as a reflection of good faith").

However, courts have recognized that "an insurer's derivative duty to negotiate, settle, or pay an insured's claim is suspended when two elements are present: (1) an adversarial proceeding is filed, and (2) a genuine disagreement as to the amount of compensable damages exists." *Rabin v. Fid. Nat. Prop. & Cas. Ins. Co.*, 863 F. Supp. 2d 1107, 1113 (D. Colo. 2012); *see also Bucholtz v. Safeco Ins. Co. of Am.*, 773 P.2d 590, 592 (Colo. App. 1988) (noting that "although the insurer's duty of good faith and fair dealing continues unabated during the life of the insurer-insured relationship, any

obligation to negotiate as a reflection of good faith may be suspended temporarily by collateral circumstances" such as arbitration).

In this case, the first element was present when Plaintiff filed this lawsuit on June 1, 2020. (Doc. # 3.) Further, it is apparent that the second element is present because there was a genuine disagreement regarding the amount of compensable damages. Standard Fire retained an orthopedic surgeon to evaluate Plaintiff's medical records. After Standard Fire received the orthopedic surgeon's report, Standard Fire informed Mr. Johnston that it was reviewing the report to make a decision regarding the claim. Rather than wait on a decision, Plaintiff opted to file suit while Standard Fire was still investigating the amount of compensable UIM coverage. As a result, this Court finds that because there was a genuine disagreement regarding damages at the time Plaintiff initiated this adversarial proceeding, Standard Fire's duty to negotiate, settle, or pay Mr. Johnston's claim was suspended. Thus, evidence of Standard Fire's post-litigation activity related to evaluating Plaintiff's claim is not relevant in this case and, therefore, is not discoverable.

The magistrate judge determined that Standard Fire had an obligation to evaluate the claim post-litigation as a result of the insurer's duty of good faith "at least when viewed through the *Silva* court's 'broad discovery' lens," post-litigation review of medical expenses is discoverable. (Doc. 42 at 3.) However, as set forth above, *Silva*'s broad discovery lens does not apply in this case. As noted by the *Sunahara* court, the scope of discovery in UIM claims is more akin to a third-party action, because the relationship between the parties is more adversarial. *Sunahara*, ¶ 28. Thus, the

8

magistrate judge's determination that the duty of good faith warranted discovery of post-litigation claim notes is contrary to law.

Moreover, relying on *Dunn v. Am. Fam. Ins.*, 251 P.3d 1232 (Colo. App. 2010) and C.R.S. § 10-3-1104(1)(h)(II), the magistrate judge determined that Defendant had a statutory duty to affirm or deny coverage of new medical records or expenses submitted post-litigation because of the continuing duty of good faith. (Doc. # 42 at 4.) The Court agrees that the duty of good faith continues through the life of a claim—even through litigation. However, although the duty of good faith continues, the insurer's duty to negotiate the claim may still be suspended during litigation. *Rabin*, 863 F. Supp. 2d at 1114. Accordingly, because the duty to negotiate a settlement is suspended during litigation, Plaintiff has not established that the post-litigation claim notes and evaluations are relevant in this case.

The Court also notes that, from a practical standpoint, requiring production of post-litigation claim notes would necessarily result in inconsistent discovery obligations between parties. Once an insured files suit, insurers are required to defend against claims of breach of contract and bad faith, and they are subject to the discovery rules and deadlines set by courts. If insurers are required to continue to evaluate claims post-litigation and provide information to plaintiffs, plaintiffs could simply circumvent discovery rules and deadlines by submitting new information and demanding an insurer's post-litigation analysis. This is not what the law requires. To hold otherwise would incentivize plaintiffs to rush to the courthouse to file a lawsuit and then continue to submit records to insurers in an attempt to avoid the discovery process.

Indeed, in this case, Plaintiff did not wait for a claim decision from Defendant. Rather, Plaintiff filed suit just a few days after Defendant received its expert's report. Plaintiff cannot now demand post-litigation claim material to circumvent the discovery process. Once a lawsuit is filed, such post-litigation claim material is not relevant.

## C.    ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE

Privileges afforded by the attorney-client privilege and work product doctrine are sacrosanct. *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981) ("The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law."). In this diversity case, the attorney-client privilege is governed by Colorado law. *People v. Trujillo*, 144 P.3d 539, 542 (Colo. 2006) (quotation marks omitted). Under Colorado law, "[t]he attorney-client privilege applies to confidential matters communicated by or to the client in the course of obtaining counsel, advice, or direction with respect to the client's rights or obligations," *id.* at 542, and "protects not only information and advice communicated from the attorney to the client, but also information given to the attorney to enable him to give sound and informed legal advice," *Gordon v. Boyles*, 9 P.3d 1106, 1123 (Colo. 2000).

The work product doctrine is governed by federal law. *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998). Pursuant to Rule 26(b)(3)(A), "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," unless "the party shows that it has substantial need for the materials

to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Although documents prepared in the ordinary course of business by insurers are not protected from disclosure, documents are protected if they are prepared in anticipation of litigation. *Hawkins v. Dist. Ct. In & For Fourth Jud. Dist.*, 638 P.2d 1372, 1377–78 (Colo. 1982).

As noted by the magistrate judge, "every decision made by the insurer [post-litigation] is logically done in the context of a pending lawsuit." (Doc. # 42 at 3.) Indeed, in this case, counsel for Defendant "proffered that after the lawsuit was filed, a new adjustor took over [the claim] file, and that adjustor has been communicating with defense counsel on a regular basis." (Doc. # 44 at 2.) There is no dispute that the claims activity which Plaintiff seeks relates to post-litigation claims notes and evaluations. Even if the notes and evaluations were relevant—which they are not—the notes are protected by the attorney-client privilege and work product doctrine.

The Court finds the district court's decision in *Morrissey v. Allstate Ins. Co.*, No. 08-cv-02174-LTB-MJW, 2009 WL 2400963, at *2 (D. Colo. Aug. 5, 2009) instructive. In that case, the plaintiff sought the post-litigation discovery from a claim representative who began working on the claim after the lawsuit was filed. The Court determined that "[i]t is clear that any work performed by [the representative] would be protected by either the work product doctrine or attorney-client privilege. Moreover, there is no evidence to suggest that [the claim representative] did any work on the underlying underinsured motorist claim." *Id.* Accordingly, the court did not permit discovery on post-litigation claims notes.

Similarly, here, a new representative was appointed to the claim after litigation commenced. Counsel for Defendant has communicated with that adjuster regularly regarding post-litigation evaluations. Accordingly, based on the record before the Court, any work performed by that claim representative would necessarily be protected by the work product doctrine or attorney-client privilege.[1]

## IV.   CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

- The Court SUSTAINS Defendant Standard Fire Insurance Company's Rule 72(a) Appeal of And Objections (Doc. # 44), and the Court further OVERRULES Magistrate Judge Hegarty's Discovery Order Dated June 11, 2021 (Doc. # 42); and

- The stay of this case is LIFTED. The Court DIRECTS the parties to follow Magistrate Judge Hegarty's practice standards to set any remaining scheduling deadlines in this case.

DATED:  April 25, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

---

[1] Plaintiff submitted a notice of supplemental authority on August 2, 2021. (Doc. # 49.) The notice attached a district court's order overruling objections and compelling production of claims documents withheld as privileged in *Darin Menapace v. Alaska National Insurance Company*, Civil Action No. 20-cv-00053-REB-STV. *Darin Menapace* is inapplicable to this case because it involved pre-litigation claim notes, communications, and evaluations—not post-litigation claim activity such as in this case.